## VANORE v. IMPROTA.

Court of Appeals of District of Columbia.

Submitted January 11, 1928. Decided
April 2, 1928.

Petition for Rehearing Denied April 21, 1928.

No. 2001.

1. Patents ⬤⟲91(4)—Evidence held to show applicant's conception and disclosure of invention for winding lame on quills before application for Improta patent June 3, 1924.

Evidence *held* to show that applicant for patent on method of winding and unwinding lame on elongated quills conceived and disclosed invention before application on which Improta patent of June 3, 1924, was issued.

2. Patents ⬤⟲90(5)—One putting invention for winding lame to no further use after weaving only 15 inches of cloth held not entitled to award of priority over Improta patent June 3, 1924, granted on prior application.

One putting invention for winding lame on elongated quills to no further use, after weaving only 15 inches of cloth because of failure to secure contract to put it to commercial use, and filing no application for patent until over a year after learning of Improta patent of June 3, 1924, *held* not to have reduced invention to practice before filing of application for such patent, as required to entitle him to award of priority, though he was first to conceive invention.

3. Patents ⬤⟲1—Primary purpose of authorizing patent laws was to promote science and useful arts for public benefit.

Primary purpose of conferring on Congress power to pass patent laws and grant patent rights to inventors for a limited time was not to help or reward inventor, but to promote progress of science and useful arts for benefit of public and organized society.

4. Patents ⬤⟲30(1)—Inventors have no right to conceal or withhold inventions without just cause.

Inventors have no right, without just cause or reason, to conceal their inventions or withhold them from public.

5. Patents ⬤⟲90(2), 91(1)—All equities and presumptions are in favor of inventor first filing application for patent, as against inventor inexcusably delaying assertion of priority.

As against inventor, guilty of inexcusable delay in asserting his priority of conception according to law, all equities and presumptions are in favor of inventor first filing application for patent, though later in conception.

6. Patents ⬤⟲91(1)—Courts may presume that claim of reduction to practice by inventor, unreasonably delaying application for patent without reasonable excuse, was only abandoned experiment.

If inventor unreasonably delays taking of necessary steps to secure patent, without reasonable excuse, courts are warranted in presuming that his claim of reduction to practice before application for patent granted to another was nothing better than abandoned experiment.

Appeal from the Commissioner of Patents.

Interference proceeding between Guiseppe Vanore and Ralph Improta. From a decision of the Commissioner of Patents, affirming decisions of the Examiners in Chief and Examiner of Interferences, awarding priority of invention to Improta, Vanore appeals. Affirmed.

J. W. Steward, of Paterson, N. J., for appellant.

J. W. Milburn, of Washington, D. C., for appellee.

Before MARTIN, Chief Justice, VAN ORSDEL, Associate Justice, and SMITH, Judge of the United States Court of Customs Appeals.

SMITH, Acting Associate Justice. This is an appeal by Guiseppe Vanore from the decision of the Commissioner of Patents, affirming the decision of the Examiners in Chief and the Examiner of Interferences, awarding priority of invention to Ralph Improta.

The invention involved is a method of winding lame or other smooth, flat filaments on elongated quills, and the unwinding of the lame or filament therefrom. The issue is defined in eight counts, of which the following are typical:

"Count 1. The method of winding lame or other smooth, flat filament upon a core having an abutment at one end, consisting in winding the filament, flat side contacting, back and forth upon the core to form a plurality of superposed layers, while advancing the successive layers along the core from the smaller end toward the abutment thereof and carrying the inner ends of the layers into engagement with the abutment."

"Count 6. A wound package usable in a loom shuttle without disintegration and snarling under the starting and stopping of the shuttle, comprising a shuttle quill having a tapered peripheral surface at an extremely acute angle to the quill axis, and a relatively heavy non-yieldable metal mass solidly and anti-slippingly surrounding said quill and incapable of being disintegrated by the starting and stopping of the shuttle, said mass consisting of a filament of flat metal traverse-wound on said quill into layers gradually receding from the smaller end of the quill at one end of the mass and substantially all terminating on said tapered peripheral surface at the other end of said mass.

"Count 7. A method of unwinding a smooth flat filament from a quill or other core on which it is wound in a plurality of superposed layers which are advanced along the core from one end thereof, consisting in pulling the filament toward the end of the core from which the layers of windings are advanced."

Prior to the invention which is here the subject of controversy great difficulty was experienced in weaving lame from quills which were wound from the larger towards the smaller end thereof with successive layers of lame. Lame so wound, after being placed in the shuttle and submitted to the shocks resulting from throwing the shuttle backward and forward, slipped off the quill and became entangled and snarled. The snarling and tangling caused the breaking of the lame and consequently a suspension of the weaving.

The invention for which both parties claim priority prevents the snarling and slipping on the quill, by reversing the operation of winding the lame on the quill. That is done by boring a hole in the small end of the quill, reversing the quill on the winding machine, and winding the lame from the small end to the large end of the quill.

Improta filed his application to patent the invention just described on June 23, 1923, and on that application a patent was issued to him on June 3, 1924.

According to Vanore's preliminary statement, he conceived the invention about the second week of September, 1922, and on that date first embodied his conception in a full size wound package, and successfully put the package in operation in the city of Paterson, N. J. His application for a patent was not filed until October 20, 1924. Vanore is therefore the junior party, and upon him was imposed the burden of proving in the interference proceeding that he was the prior inventor.

Testimony for the Appellant Material to the Issue.

Guiseppe Vanore testified in his own behalf that he was a loom fixer and weaver, and that he was employed in that capacity by Bramson & Sachs in September, 1921; that in the second week of September, 1922, a satin warp came from outside with a box of lame and some quills or bobbins ready for use; that he put a warp in the loom and started the quill in the loom; that he could not get any "pick in the cloth," because the material came off the quills; that he worked 25 or 30 quills, and did not get even 4 inches

of cloth; that he came to the conclusion that it was no use to go on that way, spoiling material and costing money; that he then took four empty quills and, after boring a hole in the small end, put the point of quill Exhibit 2 on the butt of the spindle and the butt of the quill on the point of the spindle; that by means of the spindle he wound lame 2 inches in length from the point of the quill; that he put the quill so wound in the shuttle, and after placing the shuttle on the loom actually wove cloth with it; that he next wound on another quill about 2½ inches of lame, and tried it in the same way as the first quill, and it went first-class; that his sister, Antonetta Grico saw these quills work; that he nearly filled other quills with lame wound in the same way as the first quill, and that they worked fine on the loom; that his brother, Nicola Vanore, started the loom to working the quills last referred to, and that he saw those quills work; that he filled other quills, and called Billy White to see them work; that White said, "Joe, you got a good idea; * * * don't tell anybody, because some day you make money out of it;" that the fully wound quills represented by Exhibit 8 wove about 15 inches of cloth; that he told Frank Mingione, of the Dante Silk Company, about his invention, and asked him to get work for the witness on lame material; that the witness explained everything to Mingione; that the witness thought that the quills represented by Exhibit 2 were too thick on the butt, and a little thin on the point, and he made quill Exhibit 9, which would carry more material.

On cross-examination Guiseppe Vanore said that at the time he made his experiment with the quills Bramson & Sachs did not make cloth out of lame, but "a warper weaving lames comes from outside"; that he guessed the warper came from the Meadow Silk Company, and that he came and wove the warp with lame; that the boss told the witness, "That's a warp; any time you got time to, put it up on the loom;" and he put it on the loom and started to work on it right away; that the warper came from outside to Bramson & Sachs, and brought with him the quills with which he first tried to weave the warp; that the witness had seen lame before, but not the quills on which the lame was wound; that he had worked in the Dante Silk Mills with lame on different quills than those which were brought by the warper; that the lame slipped from the quills with which he worked when employed by the Dante Silk Mills Company; that the lame slipped from the quills which the warper

brought, but did not slip after the witness changed them; that the witness was a laborer with Bramson & Sachs, and did not use his invention after he proved that it would work; that it was his idea to get into business as soon as he could, and then put his invention in operation; that in August or September, 1923, he bought 20 plain looms and worked on his invention in the Miesch mill of the Jeffroy Silk Company; that the quills that he used in 1923 and 1924 are the same kind of quills that Improta had a patent for; that, as he was working on commission, the Jeffroy Silk Company supplied him with the quills with which he did the work; that in *August, September, or October, 1923*, he knew that Improta had a patent on the quills with which he worked at the Jeffroy Silk Company's mill; that he did not know where those quills came from; that they represented his idea exactly; that when he saw the quills furnished by Jeffroy he did not know who had the patent on them until 1924, but that as soon as he saw them he said those are the quills that I have to make; that he did not file an application for a patent, because he did not have an opportunity to do so, and was a laborer in Jeffroy's place.

"Q. Did Mr. Improta ever tell you that he had filed an application for patent upon this invention? A. I guess he says to me: 'I got to go to Washington.' In 1923, about March or April, something like that—maybe May—he don't told me what he got to do, only he told me he got to go to Washington."

The witness then stated that he could not remember whether Improta told him about the invention after the latter came back from Washington; that in March, 1923, the witness saw Improta experimenting with lame on looms, but that the experiment was not a success; that the witness said nothing about his invention to Improta.

Frank Mingione testified, for Vanore, that he was a silk manufacturer and understood silk, lame, tinsel, and yarn weaving; that Vanore told him in 1922 that he had a way of winding the lame which would "run good on the loom," and requested witness to get work on lame; that the witness did not know what Vanore meant, but that he went to New York and tried to secure a contract for making lame cloth, and was informed by concerns there that they could not use the kind of cloth the witness wanted to make for them, because they could import it cheaper than the witness could make it; that he told Vanore that it was no use to make the cloth, because it could not be sold; that Vanore stated to the witness, in the last week of September or the first week of October, 1922, that he could make lame cloth on the loom by putting the quill into the spindle backwards; that a couple of days afterwards Vanore showed the witness the quill and described to him how it operated; that the quill shown to him had a hole in both ends; that he received a letter from Rosenstein Bros. not to manufacture lame with quills like that shown to him by Vanore.

William J. White testified, for Vanore, that he was a silk warper by occupation; that he was working for Bramson & Sachs in 1922; that he knew G. Vanore, whom the witness called "Joe," and that Vanore called the witness "Bill"; that when Bramson & Sachs first tried to weave lame, or tinsel, there was a great deal of trouble, for the reason that the lame did not come off the quill properly, thereby causing a lot of waste and imperfect cloth; that Vanore had trouble with weaving lame, but overcame the difficulty; that Vanore, as loom fixer, tried to make the lame run properly, and finally succeeded by drilling a hole in the small end of the quill and reversing the winding of the lame on the quill; that about the first week of September, 1922, Vanore wound in reverse a small quantity on one of the quills; that the quill so wound ran perfectly in the loom; that the witness saw Vanore use seven or eight quills wound in reverse, and that all of the quills so wound were satisfactory; that Vanore wove in the presence of the witness 12 or 13 inches of cloth with the reversed quills; that the quills theretofore used had a hole in the butt, and that the witness saw Vanore drill a hole in the small end of the quill; that after the hole was drilled he put the quill on the quilling machine, by inserting the spindle in the hole in the small end of the quill; that, so inserted, the quill was in a position the reverse of that for which the quill was originally designed; that when the quill was partially filled with lame Vanore put it in the shuttle, and, until the quill ran out of lame, operated it in the loom without breaking the lame; that Vanore filled several more quills by winding them in the same way as the first, and that the filled quills so wound operated perfectly; that the testing of the quills wound in reverse was completed in less than a day; that the witness told Vanore that the only fault of the quill was that it would not hold enough material; that Vanore replied he would make the quill smaller, but on the pattern of a normal or ordinary quill.

On cross-examination the witness testified positively that Bramson & Sachs were en-

gaged in weaving cloth out of lame, but that they used only one loom for that purpose; that the loom did not work continuously, and he could not say that the cloth made on it was made to sell; that the loom was used in Bramson & Sachs' mill for a few days off and on, but that the lame did not run; that Vanore tried every means to make the lame run smooth, before he finally conceived the idea of putting a hole in the small end of the quill and back-winding the quill; that the witness told Vanore, in May or June, 1923, when he quit the firm that bought Bramson & Sachs out, that he hoped to see Vanore "put over" his patent successfully; that he had never testified in a court proceeding before.

Josephine Logan, a witness for Vanore, testified that she was a quill winder by occupation and was employed in that capacity by Bramson & Sachs; that, to wind the quill, the big end of the quill was placed on the spindle, but that in the first part of September, 1922, she saw Vanore in the Bramson & Sachs mill place the quill on the spindle in another way and wind lame on it; that she knew that Vanore had so placed the spindle and wound it with lame in the first week of September, 1922, because she went on her vacation in the last week of August, and came home the Sunday before Labor Day, and went to work on the following morning; that Vanore did the winding of the quill so placed on her quilling machine.

Antonetta Grico, a witness for Vanore, testified that she was a sister of Vanore, and was a weaver for Bramson & Sachs in the year 1922; that in that year Bramson & Sachs attempted to weave lame, but failed in the attempt; that her brother wove lame in the month of September, 1922, from a quill wound in the ordinary way; that he wove about eight inches of lame cloth, but that the woven material was bad; that her brother finally put a hole in a quill and wound it from the tip to the butt; that the cloth woven with it was very nice; that she saw him put holes in four quills; that her brother put the quill with which the weaving was done on the spindle, with the point of the quill inward or toward the machine; that the first quill so placed by her brother on the spindle was not wound full, but that he put a little more material on the next quill; that she saw him put the first quill so wound in the shuttle; that warper Bill White and Nick Vanore saw her brother do the things to which she testified.

On cross-examination the witness said that, when the first quill was wound, she was taking care of the spool, and that her brother was taking care of the bottom quill; that she was holding the spool on a piece of straight wire, and was holding it up high with her left hand.

"Q. Was there any tension on the spool? A. What's that?

"Q. Did you have anything to keep the spool from turning too fast? A. What do you mean, a weight?

"Q. Yes. A. No; there wasn't any."

The witness then stated that the winding of the quills to which she testified took place right after Labor Day in 1922, and that she remembered that it was in 1922, because she was very sick that year; that her brother drilled the holes in the tip end of the quills.

Walter Eardley testified in rebuttal, on behalf of Vanore, that he put bobbins on a wire and holding the tension with his fingers, after putting them over a glass bar, ran about 12 on quills; that the lame on three of the quills broke in the loom and one ran all right; that, after giving a different set to the guider, the rest ran without breaking. On cross-examination Eardley said that he held with both hands the wire on which the spools of lame were placed, and that it was necessary to use both hands to get tension.

Testimony for Appellee Material to the Issue.

Ralph Improta testified on his own behalf that he had been connected with the firm of Rosenstein Bros. from 1921, and that prior to that time he was employed by A. Meadow & Sons as a loom fixer; that he began to work with lame quills for Rosenstein Bros. in the early part of 1923, and used a quill, the butt end of which was put on the spindle; that a quill of that kind did pretty good, but did not produce enough of cloth; that early in 1923 Rosenstein Bros. were notified to quit using that quill, and that then the witness started to work on a new quill; that he made several kinds of quills, and finally, in the latter part of May, 1923, produced a quill, Exhibit No. 10, the thin point of which was put up against the spindle; that the first layers of lame were wound on the thin end of Exhibit 10, and were wound towards the large end of the quill; that Exhibit 10 proved to be a success when used for weaving lame, and is the quill which has been used since the latter part of May, 1923, by Rosenstein Bros. for weaving lame; that he heard about somebody winding a quill by having some one hold a spool of lame on a wire without tension; that he tried to wind a spool without tension, but found that the lame came right off, after four throws of the shuttle in which the quill was placed; that G. Vanore saw the

witness in May, 1923, working on quills in Rosenstein Bros.' mill; that Vanore helped the witness to try to run the ordinary quill better; that Vanore never showed the witness anything, simply watched and put the fur in the shuttle; that after, the witness filed his application for a patent in June, 1923, he told Vanore that he had been to Washington to patent the quill made by the witness; that at that time he described the quill to Vanore, and said that the idea was to back-wind the quill by putting the small end of the quill on the spindle; that, when the witness showed his quill to Vanore at that time, Vanore stated to the witness that he had the same idea, but that, as long as the witness had it, it was all right; that that was the only time that Vanore ever spoke to the witness about Vanore's idea of the quill, and that after the witness got his letters patent, in September or October, 1924, Vanore met the witness on the street and asked him what was the idea of sending him a letter forbidding the use of the quill; that witness said that the letter had been sent to Jeffroy; that Vanore then said, "What's the difference; if Jeffroy has to stop, I will be compelled to stop, too, because I am working for Jeffroy on commission;" that, when Vanore asked his advice, the witness told him to see Rosenstein Bros. On cross-examination Improta said that he began to work on his own quill in the beginning of May, 1923, and that he never back-wound any quill until May, 1923.

Charles Rosenstein testified, for Improta, that the firm of Rosenstein Bros. used lame in their mill ever since the summer of 1922, and that they used the ordinary quill for weaving lame; that the ordinary quill ran along all right, but that it produced cloth very slowly, because you had to stop the loom too many times in order to refill the shuttle; that his firm began to use a quill which was wound from the point of the quill towards the butt, after his firm had been informed of that method of winding by Improta in May, 1923; that Improta, in May, 1923, told the witness about his method of winding lame, and showed the witness how it was done; that a quill cannot be wound by holding a spool of lame in a person's hand on a wire; that the witness wound the quill in that way, and that after running four throws of the shuttle it broke.

Arthur Morris testified, for Improta, that he saw Improta in May, 1923, working on quills wound from the small end towards the butt.

Max Lessman testified that, after he went to work for Rosenstein Bros. in 1923, he saw Improta working on quills which were put into the winding machine with the point towards the spindle.

Philip Saracco testified that he first saw lame used for weaving at the end of the season of 1922, and that the lame was put on the ordinary quill; that in the second or third week of May, 1923, Rosenstein Bros. began to use a quill made by Improta; that the winding of the quill made by Improta was the reverse of that of the first quill used by Rosenstein Bros.

Lucile Le Conte testified, for Improta, that she worked for A. Meadows & Sons two years prior to October, 1922, and that she never saw any tinsel lame in the mill of Meadows & Son while she worked there; that since October, 1922, she has worked for Rosenstein Bros., and that the quills of lame used by that firm are wound from the point to the butt; that she did not use quills at Meadows & Sons, and that she wound the thread on paper cops.

Abraham Bramson testified, on behalf of Improta, that he was a member of the firm of Bramson & Sachs from February, 1921, until June, 1923, and that that firm was engaged in the business of manufacturing silks; that his firm never did any work with lame, and that he never got any lame from A. Meadow & Sons; that he did not see anybody bring lame into the mill of Bramson & Sachs, and that, if a warper had come into the mill of Bramson & Sachs and brought lame, he would have known of it. On cross-examination Bramson said that, at the time he was a member of the firm of Bramson & Sachs, he was interested in the Paterson Iron & Metal Company and gave some attention to its affairs; that he spent more time, however, at the Bramson & Sachs mill; that he was away from Bramson & Sachs once a week, or something like that; that he could not swear that he had not been away from Bramson & Sachs oftener than once a week, as he kept no record of the matter; *that Sachs, his partner, was in the mill nearly every day, and that Vanore used to take orders from Sachs;* that he got no bill from any one for lame.

### The Opinion.

[1] The testimony of G. Vanore, Antonetta Grico, Wm. J. White, and Josephine Logan is convincing that G. Vanore conceived his invention in the second week of September, 1922, and that on the date of his conception he bored holes in the small end of quills, inserted them by means of the hole so bored on the spindle of the winding machine, wound

them with lame the reverse of the way in which such quills had been previously wound, placed the quills so partially wound in a shuttle, and wove with such quills about 15 inches of cloth. That testimony is not at odds with that of any other witness in the case, and, as it has not been impeached in any way, but is corroborated, it is entitled to full faith and credit. The testimony on behalf of Vanore as to his conception is corroborated by Frank Mingione, to whom he disclosed it in the last week of September or the first week of October, 1922. At that time, according to Mingione, Vanore showed to Mingione a quill with a hole in both ends, and explained to Mingione how the quill operated. As a result of that disclosure, and at the request of Vanore, Mingione went to New York and sought to obtain a contract for the making of lame cloth. The New York concerns declined to make a contract, on the ground that such cloth could be imported for less money than it would cost to make it in the United States. If the opinion of the New York concerns was based on the manufacture of lame cloth with the ordinary quill, they were probably right.

The contention that the testimony of Antonetta Grico was false is not supported by the record. Antonetta Grico did testify that she held a spool of lame on a wire with her left hand, while the lame was wound from the spool onto the quill, and that no weight was used to prevent the spool from turning too fast. She did not testify that the spool could be wound without tension, and was, therefore, not contradicted by the witnesses who testified that quills could not be wound with lame without tension. Tension may be applied without the use of a weight. Moreover, it must be remembered that the first quill was only partially wound with lame, and for a distance of only two inches from the small end, and that for such a winding tension might not be required.

The testimony of Bramson that his firm never used lame, that no lame was ever billed to his firm, and that, if lame had come to the mill of Bramson & Sachs, he would have known of it, does not outweigh or impeach that of Vanore's witnesses. Bramson was, at times, absent from the mill of Bramson & Sachs, and he admitted that at least once a week, if not oftener, his presence was required at the works of the Paterson Iron & Metal Company. Vanore stated that he received his orders to test the lame quills from his boss, and his boss might have been either Bramson, Sachs, or the superintendent or foreman of the mill. It is worthy of note

that Vanore was not questioned on cross-examination as to the name of his boss, and that Sachs, the partner of Bramson, was not called as a witness by Improta, notwithstanding the admission by Bramson that Vanore used to take orders from Sachs. We are satisfied that Vanore conceived the invention and disclosed it to his sister, William White, and Josephine Logan, early in September of 1922, and later in September, or in the first week of October, 1922, to Mingione.

[2] Whether Vanore reduced his invention to practice is quite another matter. After weaving with his quill 15 inches of cloth, he put his invention to no further use whatever. He filed no application for a patent until more than a year after he had learned of the success of Improta, and was spurred to that activity by a letter notifying the Jeffroy Silk Company, for whom Vanore worked on commission, that the company was infringing Improta's patent. Vanore's device was so simple that, by boring a hole in the small end of the quill, that quill could be easily attached to the winding machine then in use, and the record discloses nothing which would excuse Vanore from putting his quill into operation as a manufacturing device. He wove with his quill a little more than a foot of cloth, and, when he failed to secure a contract to put his conception to commercial use, he made no further effort to prove its industrial practicability, and allowed more than two years to elapse before he filed his application for a patent.

[3, 4] The primary purpose of conferring on Congress the power to pass patent laws and to grant for a limited time patent rights to inventors was not to help or reward the inventor, but to promote the progress of science and the useful arts, for the benefit of the public and organized society. Such being the purpose of patent laws, inventors have no right, without just cause or reason, to conceal their inventions or to withhold them from the public. Inventors who do so, not only defeat in some measure the chief end to be accomplished by patent laws, but work a most serious injustice to those who later enter the field and expend their time, money, and energies in developing a conception, reducing it to practice, making it useful to the public, and in diligently prosecuting their claims to a patent.

[5, 6] As against the inventor who is guilty of inexcusable delay in asserting his priority according to law, all the equities and presumptions are in favor of the inventor who, though later in conception, first files his ap-

plication for a patent. An inventor may have a reasonable excuse for not promptly applying for a patent; but, if he has none, and unreasonably delays in taking the necessary steps to secure a patent, the courts are warranted in presuming that his claim of reduction to practice was nothing better than an abandoned experiment. Mason v. Hepburn, 13 App. D. C. 86, 94, 95; Warner v. Smith, 13 App. D. C. 111, 114, 115, 116; Howard v. Hey, 18 App. D. C. 142, 144, 145; Quist v. Ostrom, 23 App. D. C. 69, 74.

While we are satisfied that Vanore was the first to conceive the invention, we are forced to the conclusion that his conception was not reduced to practice prior to the date on which Improta filed his application for a patent.

The decision of the Commissioner of Patents is affirmed.

Affirmed.